O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SLADE DOUGLAS, an individual,

                      Plaintiff,

       v.

CITY OF LOS ANGELES; OFFICER YABANA; OFFICER WHEELER; AND DOES 1 TO 10,

                Defendants.

Case No.: 2:20-cv-07439-MEMF-PD

**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 91]**

       Before the Court is the Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (the "Motion") filed by Defendants City of Los Angeles (the "City"), Officer Yabana ("Yabana"), and Officer Wheeler ("Wheeler," and collectively, "Defendants"). ECF No. 91. For the reasons stated herein, the Court hereby GRANTS IN PART Defendants' Motion for Summary Judgment.

/ / /

/ / /

1

**BACKGROUND**

I.    **Background**

   A.    **Factual Background**

On August 27, 2019, LAPD Officers Yabana and Wheeler (the "Officers") detained Plaintiff Slade Douglas ("Douglas") after responding to a call from the California Veterans Crisis Hotline about a potentially suicidal individual. Douglas alleges that the detention was unlawful and retaliatory. Defendants deny all allegations and assert that the Officers' actions were lawful.

   B.    **Procedural History**

Douglas filed his Complaint in this Court on August 17, 2020. ECF No. 1 ("Compl."). The Complaint brings forth causes of action for: (1) Unconstitutional Detention; (2) Excessive Force; (3) Retaliation; (4) Violation of Due Process; (5) Violation of the Americans with Disabilities Act; (6) Violation of the Bane Act; (7) Battery; (8) False Arrest & Imprisonment; (9) Negligence; and (10) Negligent Employment and Supervision. *Id.*

On August 1, 2023, the Court granted the parties' stipulation to dismiss certain claims with prejudice. ECF No. 90. Accordingly, Douglas's *Monell* claims are limited to contentions about the Los Angeles Police Department's ("LAPD") policy, practices, and procedures as it relates to California Welfare & Institutions Code section 5150, which he alleges gives officers permission to enter a residence without a warrant or exigent circumstances in violation of the Fourth Amendment. *Id.* Douglas's tenth cause of action is also limited to negligent supervision. *Id.*

Defendants filed their Motion for Summary Judgment on August 10, 2023. ECF No. 91. In compliance with the Court's Standing Order, the parties filed a Joint Memorandum of Points and Authorities ("MPA"). *Id.* The parties also filed Defendants' Joint Statement of Uncontroverted Facts (ECF No. 91-1 ("DSUF")), Plaintiff's Joint Statement of Uncontroverted Facts (ECF No. 91-2 ("PSUF")), and a Separate Statement of Evidentiary Objections (ECF No. 91-3 ("Evidentiary Objections")). The parties submitted a Joint Appendix of Declarations and Written Evidence in support of the Motion. ECF No. 92 ("Joint Appendix").

/ / /

/ / /

## II.   **Applicable Law**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion,

1  against a party who fails to make a showing sufficient to establish the existence of an element

2  essential to that party's case, and on which that party will bear the burden of proof at trial.").

3        A party cannot create a genuine issue of material fact simply by making assertions in its

4  legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235,

5  1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for

6  the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly

7  address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R.

8  Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only

9  required to consider evidence set forth in the moving and opposing papers and the portions of the

10  record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.

11  2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be

12  insufficient; there must be evidence on which the jury could reasonably find for [the opposing

13  party]." *Anderson*, 477 U.S. at 252.

14        To carry its ultimate burden of persuasion on the motion, the moving party must

15  demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102;

16  *Celotex Corp.*, 477 U.S. at 323.

17      **III.**   **Findings of Fact**[1]

18        The Court finds the following material facts are established for trial under Federal Rules of

19  Civil Procedure 56(a) and 56(g):

20        On August 27, 2019, at approximately 12:14 p.m., Wheeler and Yabana received a

21  communication from LAPD dispatch informing them that the Veterans Crisis Hotline had spoken

22  with "'Slay' [sic] Douglas and that he was considering committing suicide." DSUF 1. The Officers

---

24  [1] The facts set forth below are taken from the parties' respective Joint Statements of Uncontroverted Facts and
25  the stipulated evidence. *See* ECF Nos. 91-1, 92-2. To the extent that any statements of fact are omitted, the
     Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set
26  below were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that
     the adopted language resolves the dispute.

27  In making these Findings of Fact, the Court considered Defendants' Evidentiary Objections. ECF No. 91-3.
     The Court did not find any evidence that Defendants objected to essential to finding any fact stated herein,
28  and therefore need not reach the Evidentiary Objections.

drove to Douglas's home to perform a welfare check. DSUF 2. At approximately 12:48 p.m., the Officer arrived at Douglas's apartment unit and knocked on the door. DSUF 6. Douglas verbally expressed his confusion about the Officers' presence at his home, stating "I don't know what they [VCL] called for." PSUF 102. Nevertheless, when the Officers asked if they could enter his residence to speak with him, Douglas gave them permission to do so. *Id.* While entering, Yabana asked Douglas if there was anyone else in the house, to which Douglas responded there was not. Decl. of Jeremy Wheeler ("Wheeler Decl."), Exh. 2, 2:38-2:40. After entering the apartment, Wheeler turned to walk towards an open door to a room in the apartment to determine if anyone else might be present. DSUF 9. Douglas emphatically requested that Wheeler not do so and asked the Officers to leave. PSUF 103; Exh. 2 at 2:48-2:50.

Officer Wheeler then explained to Douglas that they received a call from Veteran's Affairs (the "VA") informing them that Douglas was threatening to commit suicide, and Douglas denied being suicidal. DSUF 15, 16. Wheeler stated the Officers were just there to make sure Douglas was not going to do something like that. DSUF 17. Wheeler asked whether Douglas understood that, and Douglas shook his head up and down indicating that he did. DSUF 17, 18. Wheeler stated that he was there if Douglas needed help, to which Douglas responded that he was "ok." PSUF 104; Exh. 2 at 3:15-3:19.[2] Wheeler stated that they were not there to bother him, at which point Douglas then elaborated on his disapproval with Wheeler's initial attempt to search his home. PSUF 105; Exh. 2 at 3:19-3:38. Yabana stated that the search was for officer safety, and Douglas responded that it was not because he did not even have to let them in. Exh. 2, 3:43-3:50. Douglas stated that he did not have any weapons, to which Yabana responded that the Officers did not know that. Exh. 2, 3:56-4:00. After stating that the Officers did know he did not have any weapons, Douglas asked the Officers to leave; in total, he asked the Officers to leave seven times. PSUF 107; Exh. 2, 4:00-4:17.

Douglas then began making a phone call, at which point Wheeler stated that he was going to put Douglas in handcuffs. Exh. 2, 4:15-4:19. Douglas replied that if Wheeler did so that would be his

---

[2] While counsel for the Officers stated at the hearing multiple times that Douglas refused to answer any questions while in the apartment, the undisputed evidence shows that Douglas was cooperative and did not ever say he would not answer any questions at this point.

choice. DSUF 28. Wheeler told Douglas to turn around, to which Douglas asked why would Wheeler put him in handcuffs. DSUF 29, PSUF 109. Then in a louder voice, Wheeler instructed Douglas to turn around and put his hands behind his back. PSUF 109. Douglas asked, "What have I done?" PSUF 110. Wheeler stated, "You're going to listen to what I said, you're going to put down the phone, you're calling 911, and I'm standing right here." Exh. 2, 4:26-4:30. Douglas asked again what he had done. Exh. 2, 4:30-4:31. Wheeler then shouted, "Put down the damn phone!" PSUF 110. Douglas asked why Wheeler was using profanity and cursing at him, while Wheeler continued to tell Douglas to turn around and put his hands behind his back. Exh. 2, 4:32-4:38. Wheeler stated, "Cause, you know what, you're calling 911 and we're standing right in front of you." 4:38-4:40. Douglas stated that he was asking the Officers to leave his residence. Exh. 2, 4:40-4:42. Wheeler stated that they were not leaving Douglas's place now. Exh. 2, 4:42-4:43. Douglas stated that the Officers had said they were there to help, to which Wheeler responded, "I'm not doing that now," and again asked Douglas to put his hands behind his back. PSUF 113; Exh. 2, 4:43-4:47. Douglas complied. DSUF 32; PSUF 113. While being handcuffed by Yabana, Wheeler stated to Douglas that he was calling 911 right in front of the Officers, and Douglas again stated it was because he was asking the Officers to leave his residence. Exh. 2, 4:49- 4:51. Wheeler started saying, "You know this" to Douglas. Exh. 2, 4:52-4:56. Wheeler said to Douglas, "You know exactly what I'm talking about," to which Douglas said he did not. Exh. 2, 5:00-5:03.

During a continued exchange with the Officers about what was occurring, Douglas stated that he had asked them to leave because the Officers were "exacerbating [his] disability," and that the Officers were aware that he had a disability, motioning towards a disabled placard on the kitchen counter. PSUF 109; Exh. 2, 5:45-5:55. Wheeler asked, "How do I know what that is?" PSUF 109; Exh. 2, 5:56-5:57. Wheeler started searching Douglas's residence and Douglas reiterated that he had asked them not to look around, at which point Wheeler told Douglas to "relax" while Wheeler walked in and looked around Douglas's bedroom, including picking up a piece of paper to examine it. PSUF 109, Exh. 2, 6:16-6:30. Wheeler then walked around the living room, which was visible from the entrance where Douglas and the Officers were standing. PSUF 109, Exh. 2, 6:33-6:42. Wheeler stated that Douglas was now in the Officers' custody, because he was under a mental

1   evaluation. Exh. 2, 7:19-7:24. Wheeler asked if Douglas owned any weapons, to which Douglas

2   stated that he already showed he did not have any, and Wheeler stated that he could go looking

3   anywhere that Douglas might have a weapon "if [Douglas] is going on a 5150 hold." Exh. 2, 7:40-

4   7:50.

5          Wheeler escorted Douglas from his unit to the apartment building's elevators, through the

6   building interior, and into the Officers' patrol car at the street. DSUF 36; PSUF 115. Wheeler had a

7   hold on Douglas's arm during this process, and at one point Douglas asks, "Why are you using the

8   arm bar on me?" Exh. 2, 8:54-9:17. At the patrol car, Wheeler stated that Douglas spoke to Alicia

9   from the Veterans Crisis Hotline, and Douglas stated he did not know anyone named Alicia and did

10  not talk to an Alicia from the VA. PSUF 118.[3] Wheeler stated to Douglas that "The worst thing

11  [Douglas] could do was make a 911 call right in front of [the Officers]." Exh. 2, 11:00-11:03.

12  Wheeler later stated that what Douglas did was "against the law." Exh. 2, 12:46-12:49.

13         Around four to five minutes after being placed in the patrol car, Douglas stated that the

14  handcuffs were hurting him, that he had already advised the Officers he had a disability, that the

15  position of the handcuffs was causing a "severe exacerbation on [his] right side," and that he had

16  cervical radiculopathy. PSUF 119; Exh. 2, 14:23-14:34. Wheeler told Douglas to "give him a

17  second," but stated that he would not "put them in the front," despite Douglas making requests for

18  the handcuffs to be placed in front of him. DSUF 42, 47; Exh. 2, 14:33-14:37. Wheeler told Douglas

19  to get out and then proceeded to check the handcuffs, stating that "these cuffs are just fine." DSUF

20  48, Exh. 2, 15:08-15:20. Douglas explained that it was the positioning of his arm that was the issue,

21  while Wheeler states, "There's plenty of room there." Exh. 2, 15:20-15:23. Douglas reiterated that it

22  was not about how much room there was, but rather the positioning of his arm. Exh. 2, 15:23-15:24.

23  Wheeler asked Douglas how he wanted his arms, and Douglas stated he wanted them re-positioned

24  to the front as a reasonable accommodation, to which Wheeler responded, "that's not how [the

25

26

27

---

28  [3] Officer Wheeler states in his declaration that this individual was named Aisha, but for purposes of this Motion this individual will be referred to as "Alicia" for consistency. Wheeler Decl. ¶ 5.

LAPD] does [their] handcuffs" and there was no policy exception. Exh. 2, 15:26-15:59. Douglas stated that he was "in severe pain," and that he needed help. Exh. 2, 16:16-16:37.

Douglas requested that a supervisor from the LAPD come to the scene. DSUF 49. The Officers called LAPD dispatch and requested a supervisor. DSUF 50. The Officers also called for medical services since Douglas asked for medical attention. DSUF 53, PSUF 123. Approximately twenty minutes after the Officers requested a supervisor, Sergeant Andrew Kang ("Kang") came on to the scene. DSUF 51; PSUF 125. Wheeler talked to Kang about the situation and explained that he handcuffed Douglas because after Wheeler started checking the apartment for other people, Douglas "immediately g[o]t[ ] irate and start[ed] calling 911 on his phone cause . . . he[ ] [was] asking us to leave, but it's like at that point, I'm already there, so I put him in handcuffs." PSUF 126; Exh. 2, 33:47-34:31. Kang then went to speak with Douglas. DSUF 51; PSUF 127. Douglas also repeated his request to have his arms handcuffed in front of his body because of his medical condition to Kang, but Kang told Douglas that LAPD policy did not allow them to do that. DSUF 52.

Soon thereafter, Los Angeles Fire Department personnel arrived in an ambulance. DSUF 54. The paramedics talked to Wheeler, then Douglas, and then recommended that Douglas be transported to a nearby hospital for medical evaluation. DSUF 55. The paramedics transferred Douglas to a gurney and handcuffed his hands on either side of the gurney rather than behind him. DSUF 57. Wheeler rode in the ambulance with Douglas and the paramedics to Good Samaritan Hospital. DSUF 62. Upon arriving at the hospital, Wheeler spoke with medical staff. DSUF 63. At the hospital, Douglas received treatment without his consent. PSUF 136.

## IV.   **Discussion**

### A.   **There are disputed issues of material fact as to Plaintiff's Unlawful Detention and Violation of Due Process Claims (First and Fourth Causes of Action)**

Defendants bring summary judgment as to Douglas's First Cause of Action for unlawful detention and Fourth Cause of Action for violation of due process under 42 U.S.C. § 1983 on the basis that there was probable cause for detention under California Welfare and Institutions Code Section 5150 ("WIC § 5150"). However, for the reasons explained below, Defendants have not met

their burden of demonstrating that there are no disputes of material fact as to whether the Officers had probable cause to detain Douglas.

### 1. A reasonable jury could find that the Officers did not have probable cause to detain Douglas under WIC § 5150

WIC section 5150(a) provides that "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to themselves . . . a peace officer . . . may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention . . . ." WIC § 5150(a). Probable cause under WIC § 5150 exists when facts are known to the officer "that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself. . ." *People v. Triplett*, 144 Cal. App. 3d 283, 288 (1983)). The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion." *Id.* "[G]enerally, mental disorder might be exhibited if a person's thought process, as evidenced by words or actions or emotional affect, are bizarre or inappropriate for the circumstances." *Id.*

Defendants analogize the situation here to *Palter v. City of Garden Grove*, where the police received a 911 call from the plaintiff's friend who relayed a number of details to the dispatcher indicating that the plaintiff was suicidal, and the officer confirmed this information directly with the friend. 237 Fed. App'x. 170, 172 (9th Cir. 2007). These details included that the plaintiff was "distraught" over a break up with his wife, that he was "worked up" because he was told that he would receive divorce papers soon, that he was in possession of pain medication, that he had been seeing therapists, that he owned a gun, that "he was 'basically like on a suicide watch,'" that he had previously talked about killing himself if his wife served him with divorce papers, and that the friend had been on the phone with the plaintiff for over an hour trying to calm him down and could not call 911 because she was afraid the plaintiff would hang up and do something. *Id.* at 171 n.2. The Ninth Circuit found that "[g]iven this extensive and detailed information," a reasonable person would believe that the plaintiff was mentally disordered and a danger to himself. *Id.* at 172. However, here, the Officers had no such extensive nor detailed information. Rather, there were no details other than

1   a second-hand communication from the Veterans Crisis Hotline reflecting that Douglas stated he

2   was considering committing suicide, without any context. DSUF 1. Moreover, the Officers did not

3   talk to Alicia prior to meeting with Douglas and only attempted to get in touch with her after they

4   had already taken Douglas into custody. PSUF 118. Therefore, *Palter* is distinguishable based on the

5   information known to the Officers prior to interacting with Douglas.

6       The other facts that the Officers relied on are in dispute and, as such, a jury could reasonably

7   interpret these facts as showing that Douglas was not a danger to himself or anyone else. To find

8   probable cause under WIC § 5150, the Officers must have known facts that would lead a reasonable

9   person to believe that Douglas was not just mentally disordered, but also a danger to himself or

10  others. *See Triplett*, 144 Cal. App. 3d at 287–88. Defendants assert that Douglas was"upset and

11  defensive," "agitated," and "angry" Mot. at 27-28; they also assert that he "rapidly cycled between

12  being seemingly calm to suddenly very upset and agitated," "was acting in an erratic, often angry,

13  bizarre manner," and "acted with erratic and volatile behavioral changes." Mot. at 35, 74. Finally,

14  they assert that they found it "bizarre and highly inappropriate" that Douglas called 911 under the

15  circumstances. Mot. at 12. But a reasonable jury could certainly disagree with these characterizations

16  in light of the video evidence. For example, a jury might find that Douglas's reaction to Wheeler's

17  attempt to search his apartment may not be odd, inappropriate, or bizarre given the circumstances, as

18  a reasonable jury could find that Douglas felt that he was justifiably asking Wheeler not to conduct a

19  search he believed would violate his rights. PSUF 102, 103. While Defendants argue that the

20  Officers "had no choice" but to detain Douglas, this is for a jury to decide. Mot. at 28.

21      Moreover, a reasonable jury could find that Douglas's reaction did not show that he would be

22  a danger to himself or anyone, as a reasonable jury could disagree with the Defendants'

23  characterizations of Douglas's actions as "agitated" or "volatile." Similarly, although Defendants

24  assert that Douglas waved his arms around while a phone was in his hands, which caused the

25  Defendants to become concerned that "he might become belligerent" or "the phone could be used as

26  a weapon," Mot. at 12, a reasonable jury could find that Douglas was not acting violently or in any

27

28

1   other way that would justify this alleged concern. Mot. at 27, DSUF 26.[4] For example, what

2   Defendants characterize as "waving his arms" could be viewed by a reasonable jury as normal

3   gesturing while speaking and Douglas raising his arms was to further emphasize that he had no

4   weapons and was not a threat to officer safety. Exh. 2, 3:58-4:01.[5] The jury could also find, based on

5   the video evidence, the fact that the Officers took Douglas down the elevators with two unrelated

6   civilians suggests that they did not have a concern that Douglas would become belligerent.

7        More significantly, a reasonable jury could find that the reason the Officers placed Douglas

8   in custody was solely because he was making a call to 911, rather than a proper reason for

9   detainment under WIC § 5150, including whether Douglas was a danger to himself or others. Not

10  only did Wheeler initiate the handcuffing right after Douglas began calling 911, Wheeler also

11  explicitly stated multiple times thereafter that his reason for handcuffing Douglas was because he

12  was calling 911 and Wheeler believed that to be illegal. Exh. 2, 4:49-4:51, 11:00-11:03, 12:46-12:49

13  (Wheeler stated to Douglas that what he did was "against the law"), 33:47-34:31; Wheeler Depo,

14  89:2-14.[6] However, Defendants concede that Douglas was engaged in protected speech when he

15  contacted 911, and in their briefing do not attempt to convince the Court that making such a 911 call

16  in the presence of officers would constitute probable cause to take someone into custody, either

17  under WIC § 5150 or any other statute. Mot. at 46. A jury could find that Douglas was detained for

18  engaging in constitutionally protected activity, rather than because the Officers believed Douglas to

19  be a danger to himself or anyone else. If so, probable cause under WIC § 5150 would be lacking.

20  Accordingly, summary judgment must be denied as to the First and Fourth Causes of Action.

21

22  _____

23  [4] Notably, Defendants argue that Douglas's behavior would lead someone to believe that he "*might* be a
    danger to himself or others" (emphasis added), but the standard is that the facts must lead a reasonable person

24  to believe the individual "*is* a danger to himself or herself" (emphasis added) Mot. at 27; *Tripplet*, 144 Cal.
    App. 3d at 288. And, it is undisputed that the Officers did not have any indication that Douglas was a threat.

25  Wheeler Depo, 169:2-5; McRae Decl., Exh. 16 ("Yabana Depo") 29:2-5.

26  [5] While the Court will not point out every reasonable dispute with Defendants' version of the facts that they
    argue the Officers relied upon in taking Douglas into custody, the Court finds that a reasonable jury could

27  disagree with Defendants' characterization of the events and of Douglas himself as acting "erratic, often
    angry, [and in a] bizarre manner." Mot. at 27-28, 35.

28  [6] In his deposition, Wheeler also responded affirmatively when asked whether he believed there was probable
    cause to detain Douglas "for any other purpose other than a 5150 hold." Wheeler Depo 86:17-87:2.

2.      No immunity applies as to Plaintiff's First and Fourth Causes of Action.

a.      *WIC Section 5278 does not immunize the Officers.*

Defendants argue that they are immune under California Welfare and Institutions Code Section 5278 ("WIC § 5278") and under the doctrine of qualified immunity. As an initial matter, WIC § 5278 states: "Individuals authorized under this part to detain a person for a 72-hour treatment and evaluation . . . shall not be held either criminally or civilly liable for exercising this authority *in accordance with the law*." Cal. Welf. & Inst. Code § 5278 (emphasis added). But such immunity is only applicable where the Officers exercised their authority lawfully. If the Officers did not do so, which a reasonable jury could find as discussed above, then there is no immunity under WIC § 5278.

b.      *The Defendants are not entitled to qualified immunity.*

In determining whether the Officers are entitled to qualified immunity, the Court must ask two questions: "(1) Was the law governing the officer's conduct clearly established? (2) Under that law, could a reasonable officer believe that the conduct was lawful?" *Case v. Kitsap County Sheriff's Dep't.*, 249 F. 3d 921, 926 (9th Cir. 2001). As to the first question, although a case need not be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotations omitted). Furthermore, "officials can be on notice that their conduct violates established law even in novel factual situations." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The focus on a qualified immunity analysis is "whether the officer had fair notice that her conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The right not to be detained without probable cause under WIC § 5150 is clearly established under the law. *Maag v. Wessler*, 960 F. 2d 773, 775 (9th Cir. 1991) (explaining that with regards to cases discussing "the fourth amendment standard in the context of seizure of the mentally ill, all have recognized the proposition that such a seizure is analogous to a criminal arrest and must therefore be supported by probable cause"); *see also Triplett*, 144 Cal. App. 3d at 287 (recognizing that the WIC § 5150 was amended "to require 'probable cause' for detention" and adapting "the test for probable cause for a warrantless arrest for a section 5150 detention"). WIC § 5150 provides authority to detain individuals when there is probable cause that they are "a danger to others, or to

12

themselves, or gravely disabled." WIC § 5150(a). Although the Court applies an objective standard in evaluating qualified immunity, the Court notes that in this case, it appears that these Officers were actually aware of this legal standard, further undermining their request for qualified immunity. Yabana Depo., 69:1-5 (testifying that the justification for detention under a 5150 hold is "danger to self, danger to others and gravely disabled"); Exh. 18 ("Field Notebook Divider") (noting that an application for a detention under WIC § 5150 maybe initiated when an "officer concludes there is **probable cause** to believe any or all of the following conditions exist," including danger to self, danger to others, or gravely disabled).

Defendants' arguments in favor of qualified immunity rest on disputed facts. For instance, Defendants argue that the Officers would not reasonably be on notice "that it was improper to detain" a person who "acted inappropriately during the investigation" or who was "not cooperating." But these alleged facts are disputed—including whether Douglas acted inappropriately and whether they detained him because of his "inappropriate" behavior, as opposed to behavior—calling 911— that was appropriate and lawful.

Furthermore, even if it were the case that there is no decided case on precisely the same facts that would place the Officers on notice that their conduct was unconstitutional, a "materially similar case" is not necessary when faced with "'an obvious case.'" *White v. Pauly*, 580 U.S. 73, 79-80 (2017); *see also Brosseau*, 543 U.S. at 199 (citing *Hope*, 536 U.S. at 738 for the proposition that where a constitutional violation "was 'obvious' that there need not be a materially similar case for the right to be clearly established"). The Court finds that interpreting the facts in the light most favorable to Douglas, this is a rather obvious case. For example, the question could be restated as whether the Officers were on notice that it was improper to detain a person who was doing nothing illegal or threatening. In resolving this question, the Court resolves the second part of the qualified immunity test and finds that no reasonable officer could believe that there was probable cause for the detention. Based on the record before it, the Court finds that Defendants have set forth no undisputed facts, other than the initial communication from the VA, from which the Court can even draw an inference that Douglas was a danger to himself or others. This is the standard to detain as clearly established by WIC § 5150. Accordingly, qualified immunity is not applicable to the Officers here.

**B.** **There are disputed issues of material fact with respect to Plaintiff's Excessive Force Claim (Second Cause of Action)**

Defendants seek summary judgment on Douglas's Second Cause of Action for excessive force in violation of 42 U.S.C. § 1983 on the basis that the Officers' use of force was reasonable. However, the Defendants have not shown there is no dispute of material fact in relation to this claim.

1. A reasonable jury could find that the Officers did not use reasonable force

"Police use of force is excessive and violates the Fourth Amendment if it's objectively unreasonable under the circumstances." *Zion v. County of Orange*, 874 F.3d 1072, 1075 (9th Cir. 2017). To ascertain whether a violation has occurred, courts balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). To ascertain the government interest at stake, courts consider the non-exhaustive *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The most important factor is whether the individual posed an immediate threat to the safety of officers or others. *Id*.

In determining the reasonableness of police conduct, courts must account "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Moreover, the Ninth Circuit has repeatedly held that excessive force claims are fact-specific and rarely appropriate for resolution on summary judgment. *See, e.g., Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

a. *Type and Amount of Force*

First, the Court assesses the quantum of force used against Douglas. Douglas specifically complains of the handcuffing and grabbing, including the continued handcuffing with his hands

behind his back for a period of time despite a pre-existing medical condition that he had made the Officers aware of, as well as forced medical treatment once he was taken to the hospital.[7]

Defendants essentially argue that handcuffing on its own cannot be unreasonable nor excessive. Mot. at 37. While the ordinary use of handcuffs to arrest an individual generally is considered a low quantum of force, handcuffing in a way that affects an individual adversely due to a medical condition can lead to a finding of excessive force. *See Alexander v. County of Los Angeles*, 64 F.3d 1315, 1323 (9th Cir. 1995); *see also McFarland v. City of Clovis*, No. 1:15-cv-1530, 2017 WL 1348934, at *13 (E.D. Cal. Apr. 10, 2017) (noting that "a seemingly low quantum of force can be excessive if the officer knows about a plaintiff's disability or pre-existing medical condition and uses force that affects the disability or pre-existing condition"). Here, while Douglas told the Officers he was disabled shortly after being handcuffed, it is undisputed that Douglas did not say that the handcuffs were hurting him and exacerbating his pre-existing condition until around four to five minutes after being placed in the patrol car. PSUF 119; Exh. 2, 14:23-14:34. Therefore, the Court finds that the quantum of force prior to this point to be low. Nevertheless, after this point, Douglas continued to express that the handcuffs were causing him pain and exacerbating his pre-existing condition and requested multiple times to have his arms handcuffed in the front—which the Officers refused to do at any point until the paramedics came approximately 25 minutes later. DSUF 42, 47, 57; Exh. 2, 14:33-14:37, 15:26-15:59, 16:16-16:37. Therefore, viewing the facts in the light

---

[7] In his Complaint, Douglas complains that the medical treatment he was forced to undergo qualifies as excessive force. The Defendants acknowledge that this is a basis for the second and third causes of action, and do not attempt to convince this Court that forced medical treatment would not be an excessive use of force under these circumstances, but merely assert that Douglas has presented "zero evidence that the Officers directed any such medical care or procedures." Mot. at 38. Although in his motion Douglas fails to directly respond to this argument by Defendants, it is clear to the Court from the PSUF that Douglas has put this at issue based upon his own sworn deposition testimony and it is therefore not properly considered undisputed. *See, e.g.*, PSUF 137-139 (describing that Officers told nurse "Ricky" that they needed to find something in Douglas's system to justify his arrest, Ricky agreed to do so, and Ricky then injected Douglas without his consent). Defendants' response that these facts are directly contradicted by the Officers' declarations and not corroborated by any other witness or document is of no moment, given that these facts are supported by Douglas's own sworn testimony. It will be for the jury to determine whether what Douglas alleges actually occurred. Therefore it is inappropriate to grant summary judgment on these claims with respect to the allegations of forced medical treatment.

1   most favorable to Douglas, the Court considers that the quantum of force used was elevated due to

2   the extended handcuffing despite Douglas's requests.

3                    b.        *The Government's Interest*

4        Second, the Court applies the *Graham* factors to determine the strength of the government's

5   interest in the Officers' use of force here. Defendants argue that LAPD policy "requires"

6   handcuffing a possible 5150 detainee behind his back but provides no support for this statement nor

7   cites to any undisputed fact. Mot. at 37. The cited evidence actually indicates that handcuffing was

8   *not* required in this situation. DSUF 33, Exh. 5 ("LAPD Manual") (providing officers discretion to

9   use handcuffs under section 217.36). While Defendants also state that belligerent arrestees in

10  particular must be handcuffed with their hands behind them, as discussed above, the Court finds it

11  disputed whether Douglas ever was or appeared likely to become belligerent. DSUF 44, 45.

12  Therefore, it is disputed whether handcuffing Douglas was required or necessary given the

13  circumstances. While a jury could find that the Officers reasonably believed that Douglas's

14  complaints regarding his injuries were made solely to try to get out of being handcuffed, a jury could

15  also find that Douglas's complaints were legitimate and that the Officers' failure to exercise such

16  discretion supports a finding of excessive force. Viewing the facts in the light most favorable to

17  Douglas, the Court finds this latter interpretation of the events plausible.

18       The Court also notes that Defendants do not make any arguments under the *Graham* factors

19  supporting their interest in using force, appearing to simply argue that whatever force used was

20  "objectively reasonable." Mot. at 37.[8] But, the law requires weighing the force used against the

21  government's interest in using it—that is exactly how reasonableness is determined. *See Graham*,

22  490 U.S. at 396 ("Determining whether the force used to effect a particular seizure is 'reasonable'

23  under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion

24  on the individual's Fourth Amendment interests' against the countervailing government interests at

25

26  ──────────────

27  [8] Again, Defendants' argument of reasonableness relies on their characterization of a number of facts that are
    highly in dispute. *See* Mot. at 43 (arguing that Douglas "very quickly shifted to anger. . .was erratic and
    increasingly agitated"). The Court finds that a reasonable jury could interpret the events in the video to find

28  that Douglas was not erratic and only became agitated upon provocation from the Officers.

stake.'"). While it is true that the reasonableness test "is not capable of precise definition or mechanical application," the *Graham* factors help guide the Court's consideration. *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). The Court finds that an application of the *Graham* factors here in conjunction with the totality of circumstances weigh against finding that the force used was reasonable.

### i.   Severity of crime

The first factor clearly weighs against the government's interest in using force against Douglas, as there was no crime at issue. It is undisputed that the Officers came to Douglas's residence to perform a welfare check. DSUF 2. The purpose of a welfare check is for the benefit of the individual at issue, not because they are under suspicion of any crime. Therefore, this factor does not support finding the Officers' use of force reasonable.

### ii.   Whether Douglas posed an immediate threat

The second and most important factor of the *Graham* analysis also does not support the Officers' use of force in this instance. While Defendants say that Douglas made an "aggressive move" towards Wheeler, this is not tied to any undisputed fact and a reasonable jury could interpret that Douglas was not aggressive at any time. Mot. at 37. Defendants simply point to no facts showing that Douglas was an immediate threat to anyone at any time. Wheeler in fact testified that he did not believe Douglas posed a threat to anyone other than himself at the time and that he was a "little guy." Wheeler Depo, 168:19-169:5. Therefore, this factor does not support finding the Officers' use of force reasonable.

### iii.   Whether Douglas resisted arrest

The third *Graham* factor also does not support any governmental interest in the use of force here. It is undisputed that Douglas complied with being handcuffed, and in no way tried to resist or evade detention at any time. DSUF 32; PSUF 113. Accordingly, this cannot support the government's interest in using force here.

/ / /

/ / /

/ / /

### c. *Balancing of Interests*

Considering all the circumstances, a reasonable jury could conclude that the Officers' handcuffing and related actions towards Douglas were excessive.[9] While the Court considers that some moderate degree of force was used on Douglas, Defendants have not set forth any *substantial* government interest in using any force at all on Douglas. Accordingly, Defendants are unable to prevail on summary judgment on the undisputed facts.

### 2.    Defendants are not entitled to qualified immunity

Defendants are not entitled to qualified immunity on Douglas's excessive force claim based on the undisputed facts before the Court.[10] As an initial matter, the Court finds it well-established that it would be a violation of constitutional rights to apply any force when there is no probable cause that the individual has done anything illegal or threatening. *See Hope*, 536 U.S. at 738 (where a constitutional violation is "obvious," "there need not be a materially similar case for the right to be clearly established"). Regardless, the Court also finds it clearly established that it would be a violation for an officer "to knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Stainback v. Dixon*, 569 F.3d 676, 772 (7th Cir. 2009) (noting that "an officer's otherwise reasonable conduct may be objectively unreasonable when the officer knows of an arrestee's medical problems"); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993) ("An excessive use of force claim could be premised on [an officer's] handcuffing [the plaintiff] if [the officer] knew that [the plaintiff] had an injured arm and if [the officer] believed that [the plaintiff] posed no threat to him.").[11] Here, there is a dispute of material fact as to how seriously, if at all, the Officers considered Douglas's

---

[9] While Defendants note that other factors may be considered on the *Graham* test, the parties do not analyze any other factors, and the Court does not find that additional consideration of other factors would change the outcome of the reasonableness analysis.

[10] Again, the Court cannot find that the right at issue must involve the nuance of a WIC § 5150 investigation where the individual "exhibits outward and obvious signs of belligerence," because a reasonable jury could disagree that there were any such signs. Mot. at 51.

[11] The Ninth Circuit has also denied qualified immunity as to an excessive force claim where a plaintiff told police officers that he was ill and the officers denied his repeated request to adjust the handcuffs because of his medical condition. *Alexander*, 64 F.3d 1315 (9th Cir. 1995).

1   complaints in considering the force to exercise against him.[12] Moreover, while the position of the

2   handcuffing eventually changed when the paramedics came, Douglas sat in the patrol car handcuffed

3   for close to half an hour complaining that he was in pain. *See Alexander*, 64 F.3d at 1323 (9th Cir.

4   1995) (denying qualified immunity where plaintiff alleged his handcuffs "were readjusted only after

5   he had already been handcuffed thirty-five to forty minutes"). As such, the Court finds the Officers

6   are not entitled to qualified immunity here.

7      **C.      There are disputed issues of material fact with respect to Plaintiff's Retaliation**

8             **Claim (Third Cause of Action)**

9          Defendants bring summary judgment as to Douglas's Third Cause of Action for retaliation in

10   violation of the First Amendment on the same basis as the excessive force claim. However, as

11   explained above, Defendants have not met their burden of demonstrating that there are no disputes of

12   material fact as to whether the Officers used reasonable force on Douglas. Moreover, Douglas bases

13   his retaliation claim on his unlawful detention as well, which the Court has also found is in dispute.

14          1.      <u>A reasonable jury could find that the Officers retaliated against Douglas</u>

15          In order to plead a violation of the First Amendment, a plaintiff must show "that (1) he was

16   engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of

17   ordinary firmness from continuing to engage in the protected activity and (3) the protected activity

18   was a substantial or motivating factor in the defendant's conduct." *Capp v. County of San Diego*,

19   940 F.3d 1046, 1053 (9th Cir. 2019).

20          As Defendants have conceded that the 911 call was protected speech, the Court addresses

21   whether Defendants' detention of Douglas would "chill" or deter a person of ordinary firmness from

22   further engaging in the activity.[13] Mot. at 46. The Court finds that the detention of an individual for

23

24   —————————————

25   [12] Given that the Officers summarily rejected any request to change the placement of the handcuffs to
     Douglas's front due to alleged mandatory policies, it is unclear whether they ever legitimately considered

26   Douglas's complaints since their statements could be interpreted such that they would not have changed the
     placement regardless of the circumstance.

27   [13] Although Defendants correctly state that the inquiry is objective and whether Douglas himself was chilled
     is irrelevant, they go on to argue that Douglas was in fact not deterred. Mot. at 46. The Court does not find

28   whether Douglas was deterred relevant to the analysis.

doing anything, including making a 911 call, would be likely to deter a person of ordinary firmness from engaging in the same activity.[14] Finally, the undisputed facts show that the detention and handcuffing both occurred during or shortly after Douglas started calling 911. *See Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) (explaining that "timing can properly be considered as circumstantial evidence of retaliatory intent"). It is also undisputed that Wheeler stated multiple times that the detention was due to the engagement in the protected activity. Exh. 2, 4:49-4:51, 11:00-11:03, 12:46-12:49, 33:47-34:31; Wheeler Depo. 89:2-14. In one instance, Wheeler appears to repeatedly address Douglas's attempted 911 call by stating "you don't get to do that" and "that's not going to happen." Exh. 2, 28:49-29:03. In another, Wheeler states to Douglas that what he did, referencing the 911 call, was "against the law." Exh. 2, 12:46-12:49. Therefore, a reasonable jury could find that the Officers' conduct was motivated by retaliatory intent. Accordingly, summary judgment must be denied as to Douglas's retaliation claim.

2.    <u>Defendants are not entitled to qualified immunity.</u>

Again, the Court finds that the right at issue here—the right to be free from retaliation due to exercise of free speech—is not only clearly established, but quite obvious. *See Ballentine v. Tucker*, 28 F. 4th 54, 65 (9th Cir. 2022) (noting that it is established that it is unlawful to arrest someone "in retaliation for their First Amendment activity, notwithstanding the existence of probable cause"); *Capp*, 940 F.3d at 1059 ("And it was clear…that a government actor could not take action that would be expected to chill protected speech out of retaliatory animus for such speech."). Here, Wheeler's own statements show that he believed that Douglas's call was "illegal" and therefore this belief was likely a substantial factor, if not the sole factor, in his probable cause analysis. Wheeler Depo 97:2-14. Defendants have not attempted to argue that any such belief would be reasonable, and the Court does not find that any reasonable officer would have such a belief. Therefore, the Officers are not entitled to qualified immunity as to the retaliation claim.

---

[14] For this reason, the Court does not find compelling Defendant's argument that the First Amendment claim fails because Douglas was not *prevented* from later speaking to the supervising officer.

**D.     There are disputed issues of material fact with respect to Plaintiff's ADA Claim (Fifth Cause of Action)**

Defendants bring summary judgment as to Douglas's Fifth Cause of Action for violation of the ADA. However, Defendants have not met their burden of demonstrating that there are no disputes of material fact as to this claim.

**1.     The ADA claim properly applies to all Defendants**

Defendants argue that Douglas's ADA claim can only be brought against the City and cannot be brought against the Officers individually, but Douglas has clarified that he is bringing the claim against the Officers in their official capacities. Mot. at 55. The Court finds that Douglas may proceed with his official-capacity claims, and that the City is vicariously liable for the acts of the Officers. *See Becker v. Oregon*, 170 F. Supp. 2d 1061, 1066 (D. Or. 2001) ("Although individual defendants may not be sued in their individual capacities under Title II of the ADA, they may be sued in their official capacities because suing an individual in his official capacity is treated the same as suing the entity itself.") (citing *Kentucky v. Graham*, 473 U.S. 159, 16 (1985)); *see also Duvall v. County of Kitsap*, 260 F. 3d 1124, 1141 (9th Cir. 2001) ("When a plaintiff brings a direct suit under . . . Title II of the ADA against a municipality . . . the public entity is liable for the vicarious acts of its employees.").

**2.     A reasonable jury could find that Defendants failed to accommodate Douglas**

As Douglas does not appear to argue for a discrimination theory of liability, the Court addresses this claim under the failure to accommodate theory. *See Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014) (explaining that a plaintiff can bring an ADA claim for failure to reasonably accommodate a disability in the course of an investigation or arrest where the failure causes the person to suffer greater injury or indignity in that process than other arrestees). The plaintiff bears the initial burden of producing evidence that a reasonable accommodation existed. *Id.* It is undisputed that Douglas is a disabled individual, and that he requested multiple times to be handcuffed with his hands in front of him as a reasonable accommodation for his disability. DSUF 40, 42; PSUF 119. And, the Court finds the Officers did have discretion with how, if at all, to handcuff Douglas. DSUF 33, Exh. 5 ("LAPD Manual").

Defendants argue that the Officers were not put on notice of his back condition prior to or at the time of handcuffing, but the crux of the claim is that the Officers failed to reasonably accommodate Douglas after he informed them of his disability and requested an accommodation. Although Defendants argue that Douglas "might attempt to escape or wished to gain more mobility for reasons other than a disability," Mot. at 54, it is not undisputed that Douglas was "volatile" and "belligerent," DSUF 43, 44, and the undisputed facts reflect that there was never an indication that Douglas tried to escape or behaved in a threatening manner. Further it is undisputed that the Officers had at least some indication of the disability prior to the handcuffing—based upon Douglas's statements regarding being a disabled veteran and his pointing to the disabled placard; it may be that they did not believe any of this, but it will be for a jury to decide whether they disbelieved this and what implications that has for Douglas's ADA claim. Defendants next argue that Douglas was accommodated, because almost half an hour later, Douglas was placed on a gurney and his arms was repositioned at his sides. Mot. at 54. However, there is still an issue of whether the Officers failed to reasonably accommodate Douglas *prior to that*, as Douglas alleges that their failure to change the positioning of the handcuffs did cause him greater injury than he otherwise would have suffered. DSUF 40. Accordingly, the Court finds that there are material facts in dispute as to the ADA claim.

        3.    <u>A reasonable jury could find the Officers acted with deliberate indifference</u>

To recover damages on his ADA claim, Douglas must show deliberate indifference, which requires "both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that [] likelihood." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). "When the plaintiff has alerted the public entity to his need for accommodation . . . the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id.* "[I]n order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.*

Here, Douglas told the Officers of his disability and requested a reasonable accommodation in the form of having his hands placed in front of him. DSUF 40, 42. Accordingly, the first part of the test is met. Moreover, a reasonable jury could find that the Officers acted with deliberate

1    indifference in rejecting Douglas's requests. Wheeler's statement that he would not make the

2    accommodation immediately after that Douglas first requested it can lead to the reasonable inference

3    that Wheeler did not seriously consider Douglas's request. DSUF 42, 47; Exh. 2, 14:33-14:37.

4    Moreover, it appears that the Officers were laughing and joking about Douglas's statements about

5    his disability at certain points, which could support a finding of deliberate indifference. Exh. 2,

6    26:56-27:15. Therefore, the Court denies summary judgment.

7         **E.    Douglas has failed to meet his burden on his *Monell* Claim**

8         Douglas has also sued Defendants under section 1983 for municipal liability. Although

9    *Monell* allegations are included in the Complaint, ECF No. 1 ("Compl.") ¶¶ 33-36, in the parties'

10   meet and confer, Douglas agreed to limit his *Monell* claim to "the single contention that LAPD's

11   policy, practices, and procedures as it relates to Welfare & Institutions Code Section 5150

12   investigations permits officer to enter a residence without a warrant or exigent circumstances in

13   violation of the Fourth Amendment."[15] ECF No. 92-4 ("Gams Decl.") ¶ 4.

14        In *Monell*, the Supreme Court held that municipalities are "persons" subject to liability under

15   section 1983. *Monell v. Dept. of Soc. Serv. of N.Y.*, 436 U.S. 658, 690 (1978). For the municipality to

16   be liable, it must cause a constitutional violation, as a municipality cannot be held vicariously liable

17   under the theory of respondeat superior for the unconstitutional acts of its employees. *Id.* at 691. A

18   plaintiff seeking to hold a municipality liable may do so by alleging one of the following: (1) that a

19   municipal employee committed a constitutional violation pursuant to an expressly adopted official

20   policy or a longstanding practice or custom; (2) that a municipal employee was an official with final

21   policy-making authority; (3) that an official with final policy-making authority ratified a

22   subordinate's unconstitutional act. *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

23        Here, Douglas bases his *Monell* claim on an alleged LAPD policy that under a WIC § 5150

24   welfare check, officers are permitted to enter a residence without a warrant and in the absence of any

25   exigent circumstance. To prevail on this theory, Plaintiffs must show a "longstanding practice or

26   _____

27   [15] Douglas does not appear to dispute that his *Monell* claim is so limited or that "[a]ll other *Monell* claims and
     allegations have been abandoned . . . and may be dismissed with prejudice." ECF No. 92-4 ("Gams Decl.") ¶

28   4; Mot. at 61-63. Accordingly, the remainder of the *Monell* claims are DISMISSED with prejudice.

1   custom which constitutes the 'standard operating procedure' of the local government entity."

2   *Gillette*, 979 F. 2d at 1346. The custom must be so "persistent and widespread" that it constitutes a

3   "permanent and well settled" city policy. *Monell*, 436 U.S. at 691. "A section 1983 plaintiff may

4   attempt to prove the existence of a custom or informal policy with evidence of repeated

5   constitutional violations for which the errant municipal officials were not discharged or

6   reprimanded." *Gillette*, 979 F.2d at 1349.

7           The Defendants meet their burden of showing that there was no such unlawful policy and it

8   was not the moving force behind the entry into Douglas's apartment. *See* Reyes Depo 23:1-23, 25:3-

9   17. The burden therefore shifts to Douglas to show a genuine issue of material fact in support of this

10  claim. Douglas points to the 30(b)(6) testimony of Detective Elizabeth Reyes, but the Court finds

11  that it does not show that there is an LAPD policy which allows officers to "enter a residence

12  without a warrant and in the absence of exigent circumstances if the door of the residence was

13  opened" during a welfare check. Mot. at 62. Douglas does not actually cite to any testimony from

14  Reyes that states this explicitly. However, Douglas does offer certain portions of her testimony in his

15  facts. PSUF 146-152. Specifically, Douglas states that Reyes said "[t]he officers would break a door

16  down to enter just based on that information"; in fact, Reyes stated the opposite in her deposition—

17  that the officers "**would not** break a door down to enter just based on that information." Exh. 14,

18  24:3-5 (emphasis added); DSUF 91.[16] Moreover, Douglas cannot show that any such policy was the

19  "moving force" in this case given that it is undisputed that the officers entered lawfully without a

20  warrant and exigent circumstance because he permitted them to enter. It appears to the Court that

21  Douglas would have this Court conclude that a policy permitting officers to enter without a warrant

22  would also permit the officers to *remain* in an individual's home regardless of whether they

23  withdrew consent. But as discussed, Douglas has not carried his burden with respect to showing that

24  there was any policy permitting officers to enter or remain without a warrant. Accordingly, Douglas

---

[16] At the hearing, counsel for Douglas clarified that this was a typo in the PSUF, but the Court does not find that this changes the analysis.

1   has failed to create a genuine issue of material fact and the Defendants are entitled to summary

2   judgment in their favor.[17] The Court GRANTS Defendants' Motion as to Douglas's *Monell* claim.

3         **F.**      **There are disputed issues of material fact with respect to Plaintiff's Bane Act**

4                 **Claim (Sixth Cause of Action)**

5           Defendants bring summary judgment as to Douglas's Sixth Cause of Action under the Bane

6   Act. The Bane Act provides that a police officer may not use a "threat, intimidation, or coercion" to

7   interfere with the exercise of a person's constitutional right. Cal. Civ. Code § 52.1. The Bane Act

8   does not require that such coercion be "independent from the constitutional violation alleged," but

9   does require "a specific intent" to violate the right. *Reese v. County of Sacramento*, 888 F.3d 1030,

10  1043 (9th Cir. 2018). "[I]t is not necessary for the defendants to have been 'thinking in constitutional

11  or legal terms at the time of the incidents, because a reckless disregard for a person's constitutional

12  rights is evidence of a specific intent to deprive that person of those rights.'" *Id.* at 1045 (emphasis

13  omitted). Defendants rely heavily on the argument that there were no constitutional violations to

14  begin with, which the Court has determined a reasonably jury could find. Mot. at 65. Moreover, as

15  addressed with the retaliation and ADA claims, a reasonable jury could find that the Officers acted

16  with at least reckless disregard, if not a specific intent, to violate Douglas's rights. Accordingly,

17  summary judgment must be DENIED as to this claim.

18        **G.**      **There are disputed issues of material fact with respect to Plaintiff's Battery**

19                **Claim (Seventh Cause of Action)**

20          Defendants also move on Douglas's claim of battery.[18] As against a police officer, a battery

21  claim requires a showing of unreasonable force. *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269,

22  1272 (1998); *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. Apr. 29, 2010). As

23  analyzed above, the Court finds genuine issues of material fact as to the reasonableness of the

---

[17] The Defendants also argue that this theory was not properly preserved; Douglas responds that it is based upon newly discovered evidence. Mot. at 58-59, 61. The Court need not reach this issue in light of its finding that there is no genuine issue of material fact with respect to the existence of this policy.

[18] Defendants also make arguments regarding an assault claim but given that Douglas titled the seventh cause of action solely as one for battery and does not address the argument on assault in opposition, the Court considers the assault claim waived. Compl. at 16.

1    Officers' use of force against Douglas. *See Saman v. Robbins*, 173 F.3d 1150, 1156–57 (9th Cir.

2    1999) (treating Section 1983 and state law battery claim similarly). Thus, the Court DENIES

3    summary judgment as to the battery claim.

4    **H.    There are disputed issues of material fact with respect to Plaintiff's False Arrest**

5    **and Imprisonment Claim (Eighth Cause of Action)**

6    Defendants move on Douglas's claim of false arrest and imprisonment, arguing that the

7    Officers are immune under California Penal Code section 874(b) if they had probable cause.[19] Mot.

8    at 71. However, as discussed previously, the Court finds that there are disputed material facts as to

9    whether the Officers had probable cause to detain Douglas. Therefore, the Court DENIES summary

10   judgment as to the false arrest and imprisonment claim.

11   **I.    There are disputed issues of material fact with respect to Plaintiff's Negligence**

12   **Claim (Ninth Cause of Action)**

13   Defendants move on Douglas's claim of negligence. To establish negligence, a plaintiff must

14   show that (1) the defendant had a duty to use due care; (2) the defendant breached that the duty; and

15   (3) the breach was the proximate or legal cause of the plaintiff's injury. *Hayes v. County of San*

16   *Diego*, 57 Cal.4th 622, 629 (2013). California negligence claims are broader than Fourth

17   Amendment claims and consider the totality of the circumstances. *Id.* at 629, 638. Defendants rely

18   on their argument that the Officers had probable cause to detain Douglas and reasonable force was

19   used. As the Court has already found these two issues to be in dispute, the Court DENIES summary

20   judgment as to the negligence claim.

21   **J.    There are disputed issues of material fact with respect to Plaintiff's Negligent**

22   **Supervision Claim (Tenth Cause of Action)**

23   Defendants bring summary judgment as to Douglas's claim for negligent supervision.

24   Negligent supervision can be brought against the City only vicariously, through the acts of a

25   supervisor, in this case, Sergeant Kang. *de Villers v. County of San Diego*, 156 Cal. App. 4th 238,

26

27   _____

28   [19] The Court notes that section 874(b) appears to have been repealed. Nevertheless, the Court accepts the general proposition that an arrest is lawful if probable cause exists. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).

255 (2007). "To establish negligent supervision, a plaintiff must show that a person in a supervisorial position over the actor had prior knowledge of the actor's propensity to do the bad act." *Z.V. v. County of Riverside*, 238 Cal. App. 4th 889, 902 (2015). However, the Defendants have met their burden in showing that there is no evidence in the record reflecting that the Officers had a "propensity" to commit any bad acts, or that Kang would have had such knowledge of a propensity before the incident. Rather, the evidence shows that Kang arrived at the scene after Douglas was already in custody, and Wheeler told Kang that Douglas "immediately got irate," and that Douglas has been "completely irate the whole time." Exh. 2, 33:47-35:20. Kang appears to have solely acted under the information he was given by Wheeler. Douglas has not pointed to any genuine issue of material fact to support that Kang knew or should have known that the Officers were acting unlawfully or had a propensity to do so. Accordingly, the Court GRANTS summary judgment with respect to this cause of action.

### K.    Defendants are not entitled to immunity under state law

Defendants first argue that they are entitled to immunity California Government Code section 820.2, which provides that a public employee "is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him." Cal. Gov't. Code § 820.2. Nevertheless, the Ninth Circuit has instructed that "section 820.2 immunity does not apply to an officer's decision to detain or arrest. . ." *Liberal v. Estrada*, 632 F.3d 1064, 1084–85 (9th Cir. 2011) (explaining that immunity is reserved for "basic policy decisions," not "operational decision[s] by the police purporting to apply the law").[20] Moreover, Defendants acknowledge that section 820.2 immunity is inapplicable where excessive force is used. Because there is a genuine issue of material fact as to whether excessive force was used here, Defendants are not entitled to this statutory immunity at this stage.

---

[20] While Defendants point to case law from a district court immunizing actions which are "incidental to the investigation of crimes," the Court noted that the case referenced was discussing immunity in the context of section 820.6, not section 820.2. *See Porter v. City of Davis Police Dep't.*, No. 2:14-cv-02984-KJM-DB, 2018 WL 558806 (E.D. Cal. Jan. 25, 2018) (citing *Johnson v. County of Contra Costa*, No. C 09-01241 WHA, 2010 WL 3491425 (N.D. Cal. Sept. 3, 2010). *Porter* also cites to *Green v. City of Livermore*, 117 Cal. App. 3d 82, 89 (1981) but that case stated that "neither the discretionary immunity of section 820.2 nor [other sections] immunized the City from the legal consequences of the officers' negligence…").

Defendants also argue that they are immune from liability based on Government Code section 820.4, which provides that a public employee "is not liable for his act or omission, exercising due care, in the execution or enforcement of any law." Cal. Gov't. Code § 820.4. However, the statute does not "exonerate[] a public employee from liability for false arrest or false imprisonment." *Id.* Defendants appear to concede that Section 820.4 would not apply to Douglas's claim for false arrest and imprisonment, but argue that it would be applicable to any other state claims. Mot. at 81. However, Section 820.4 is explicit that it protects public employees from liability when "exercising *due care*," which is the negligence standard. Cal. Gov't. Code § 820.4 (emphasis added). Therefore, the Defendants are not entitled to this immunity with respect to Douglas's negligence cause of action. Moreover, Douglas's other claims all arise from the same allegations as his excessive force claim, and the Court finds that similarly the Defendants are not entitled to immunity at this stage on the other claims. *See Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002) ("Most of the state law claims arise from the allegation that the individual officers used excessive force, and California denies immunity to police officers who use excessive force in arresting a suspect.").

Finally, as addressed previously, WIC §5278 is inapplicable for purposes of immunity if it is found that the Officers did not act in accordance with the law, so Defendants are not entitled to this form of immunity either.

The Court DENIES summary judgment with respect to all of the forms of state law immunity sought by the Defendants.

**CONCLUSION**

For the foregoing reasons, the Court hereby ORDERS as follows:

1.  The Motion for Summary Judgment is GRANTED as to Douglas's *Monell* claim;

2.  The Motion for Summary Judgment is GRANTED as to Douglas's Tenth Cause of Action for Negligent Supervision; and

3.  The Motion for Summary Judgment is DENIED as to all other claims, namely as to Douglas's First Cause of Action for Unconstitutional Detention, Second Cause of Action for Excessive Force, Third Cause of Action for Retaliation, Fourth Cause of Action for Violation of Due Process, Fifth Cause of Action for Violation of the ADA,

1    Sixth Cause of Action under the Bane Act, Seventh Cause of Action for Battery,

2    Eighth Cause of Action for False Arrest & Imprisonment, and Ninth Cause of Action

3    for Negligence.

4

5    **IT IS SO ORDERED**.

6

7    Dated: October 3, 2023

8    _____
     MAAME EWUSI-MENSAH FRIMPONG

9    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28